# Exhibit K

6/14/2021                              Case 2:22-cv-12159-JJCG-APP   ECF No. 1-12, PageID.379   Filed 09/12/22   Page 2 of 9
                                                Bilking the Elderly, With a Corporate Assist - The New York Times

The New York Times        https://www.nytimes.com/2007/05/20/business/20tele.html

# Bilking the Elderly, With a Corporate Assist



Richard Guthrie, 92, was tricked into giving banking data to telephone callers, who then stole money from his account, investigators say.
Ozier Muhammad/The New York Times

By Charles Duhigg

May 20, 2007

The thieves operated from small offices in Toronto and hangar-size rooms in India. Every night, working from lists of names and phone numbers, they called World War II veterans, retired schoolteachers and thousands of other elderly Americans and posed as government and insurance workers updating their files.

Then, the criminals emptied their victims' bank accounts.

Richard Guthrie, a 92-year-old Army veteran, was one of those victims. He ended up on scam artists' lists because his name, like millions of others, was sold by large companies to telemarketing criminals, who then turned to major banks to steal his life's savings.

Mr. Guthrie, who lives in Iowa, had entered a few sweepstakes that caused his name to appear in a database advertised by infoUSA, one of the largest compilers of consumer information. InfoUSA sold his name, and data on scores of other elderly Americans, to known lawbreakers, regulators say.

InfoUSA advertised lists of "Elderly Opportunity Seekers," 3.3 million older people "looking for ways to make money," and "Suffering Seniors," 4.7 million people with cancer or Alzheimer's disease. "Oldies but Goodies" contained 500,000 gamblers over 55 years old, for 8.5 cents apiece. One list said: "These people are gullible. They want to believe that their luck can change."

As Mr. Guthrie sat home alone — surrounded by his Purple Heart medal, photos of eight children and mementos of a wife who was buried nine years earlier — the telephone rang day and night. After criminals tricked him into revealing his banking information, they went to Wachovia, the nation's fourth-largest bank, and raided his account, according to banking records.

"I loved getting those calls," Mr. Guthrie said in an interview. "Since my wife passed away, I don't have many people to talk with. I didn't even know they were stealing from me until everything was gone."

Telemarketing fraud, once limited to small-time thieves, has become a global criminal enterprise preying upon millions of elderly and other Americans every year, authorities say. Vast databases of names and personal information, sold to thieves by large publicly traded companies, have put almost anyone within reach of fraudulent telemarketers. And major banks have made it possible for criminals to dip into victims' accounts without their authorization, according to court records.

The banks and companies that sell such services often confront evidence that they are used for fraud, according to thousands of banking documents, court filings and e-mail messages reviewed by The New York Times.

Although some companies, including Wachovia, have made refunds to victims who have complained, neither that bank nor infoUSA stopped working with criminals even after executives were warned that they were aiding continuing crimes, according to government investigators. Instead, those companies collected millions of dollars in fees from scam artists. (Neither company has been formally accused of wrongdoing by the authorities.)

"Only one kind of customer wants to buy lists of seniors interested in lotteries and sweepstakes: criminals," said Sgt. Yves Leblanc of the Royal Canadian Mounted Police. "If someone advertises a list by saying it contains gullible or elderly people, it's like putting out a sign saying 'Thieves welcome here.' "

In recent years, despite the creation of a national "do not call" registry, the legitimate telemarketing industry has grown, according to the Direct Marketing Association. Callers pitching insurance plans, subscriptions and precooked meals collected more than $177 billion in 2006, an increase of $4.5 billion since the federal do-not-call restrictions were put in place three years ago.

That growth can be partly attributed to the industry's renewed focus on the elderly. Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide. Some researchers estimate that the elderly account for 30 percent of telemarketing sales — another example of how companies and investors are profiting from the growing numbers of Americans in their final years.

While many telemarketing pitches are for legitimate products, the number of scams aimed at older Americans is on the rise, the authorities say. In 2003, the Federal Trade Commission estimated that 11 percent of Americans over age 55 had been victims of consumer fraud. The following year, the Federal Bureau of Investigation shut down one telemarketing ring that stole more than $1 billion, spanned seven countries and resulted in 565 arrests. Since the start of last year, federal agencies have filed lawsuits or injunctions against at least 68 telemarketing companies and individuals accused of stealing more than $622 million.

"Most people have no idea how widespread and sophisticated telemarketing fraud has become," said James Davis, a Federal Trade Commission lawyer. "It shocks even us."

Many of the victims are people like Mr. Guthrie, whose name was among the millions that infoUSA sold to companies under investigation for fraud, according to regulators. Scam artists stole more than $100,000 from Mr. Guthrie, his family says. How they took much of it is unclear, because Mr. Guthrie's memory is faulty and many financial records are incomplete.

What is certain is that a large sum was withdrawn from his account by thieves relying on Wachovia and other banks, according to banking and court records. Though 20 percent of the total amount stolen was recovered, investigators say the rest has gone to schemes too complicated to untangle.

Senior executives at infoUSA were contacted by telephone and e-mail messages at least 30 times. They did not respond.

Wachovia, in a statement, said that it had honored all requests for refunds and that it was cooperating with authorities.

Mr. Guthrie, however, says that thieves should have been prevented from getting access to his funds in the first place.

"I can't understand why they were allowed inside my account," said Mr. Guthrie, who lives near Des Moines. "I just chatted with this woman for a few minutes, and the next thing I knew, they took everything I had."

**Sweepstakes a Common Tactic**

Investigators suspect that Mr. Guthrie's name first appeared on a list used by scam artists around 2002, after he filled out a few contest entries that asked about his buying habits and other personal information.

He had lived alone since his wife died. Five of his eight children had moved away from the farm. Mr. Guthrie survived on roughly $800 that he received from Social Security each month. Because painful arthritis kept him home, he spent many mornings organizing the mail, filling out sweepstakes entries and listening to big-band albums as he chatted with telemarketers.

"I really enjoyed those calls," Mr. Guthrie said. "One gal in particular loved to hear stories about when I was younger."

Some of those entries and calls, however, were intended solely to create databases of information on millions of elderly Americans. Many sweepstakes were fakes, investigators say, and existed only to ask entrants about shopping habits, religion or other personal details. Databases of such responses can be profitably sold, often via electronic download, through list brokers like Walter Karl Inc., a division of infoUSA.

The list brokering industry has existed for decades, primarily serving legitimate customers like magazine and catalog companies. InfoUSA, one of the nation's largest list brokers and a publicly held company, matches buyers and sellers of data. The company maintains records on 210 million Americans, according to its Web site. In 2006, it collected more than $430 million from clients like Reader's Digest, Publishers Clearinghouse and Condé Nast.

But infoUSA has also helped sell lists to companies that were under investigation or had been prosecuted for fraud, according to records collected by the Iowa attorney general. Those records stemmed from a now completed investigation of a suspected telemarketing criminal.

By 2004, Mr. Guthrie's name was part of a list titled "Astroluck," which included 19,000 other sweepstakes players, Iowa's records show. InfoUSA sold the Astroluck list dozens of times, to companies including HMS Direct, which Canadian authorities had sued the previous year for deceptive mailings; Westport Enterprises, the subject of consumer complaints in Kansas, Connecticut and Missouri; and Arlimbow, a European company that Swiss authorities were prosecuting at the time for a lottery scam.

(In 2005, HMS's director was found not guilty on a technicality. Arlimbow was shut down in 2004. Those companies did not return phone calls. Westport Enterprises said it has resolved all complaints, complies with all laws and engages only in direct-mail solicitations.)

Records also indicate that infoUSA sold thousands of other elderly Americans' names to Windfall Investments after the F.B.I. had accused the company in 2002 of stealing $600,000 from a California woman.

Between 2001 and 2004, infoUSA also sold lists to World Marketing Service, a company that a judge shut down in 2003 for running a lottery scam; to Atlas Marketing, which a court closed in 2006 for selling $86 million of bogus business opportunities; and to Emerald Marketing Enterprises, a Canadian firm that was investigated multiple times but never charged with wrongdoing.

The investigation of Windfall Investments was closed after its owners could not be located. Representatives of Windfall Investments, World Marketing Services, Atlas Marketing and Emerald Marketing Enterprises could not be located or did not return calls.

Steve St. Clair, an Iowa assistant attorney general, investigated the sale of mailing lists that may have been used in the first step of a scam aimed at the elderly.
Ozier Muhammad/The New York Times

The Federal Trade Commission's rules prohibit list brokers from selling to companies engaged in obvious frauds. In 2004, the agency fined three brokers accused of knowingly, or purposely ignoring, that clients were breaking the law. The Direct Marketing Association, which infoUSA belongs to, requires brokers to screen buyers for suspicious activity.

But internal infoUSA e-mail messages indicate that employees did not abide by those standards. In 2003, two infoUSA employees traded e-mail messages discussing the fact that Nevada authorities were seeking Richard Panas, a frequent infoUSA client, in connection with a lottery scam.

"This kind of behavior does not surprise me, but it adds to my concerns about doing business with these people," an infoUSA executive wrote to colleagues. Yet, over the next 10 months, infoUSA sold Mr. Panas an additional 155,000 names, even after he pleaded guilty to criminal charges in Nevada and was barred from operating in Iowa.

Mr. Panas did not return calls.

"Red flags should have been waving," said Steve St. Clair, an Iowa assistant attorney general who oversaw the infoUSA investigation. "But the attitude of these list brokers is that it's not their responsibility if someone else breaks the law."

**Millions of Americans Are Called**

Within months of the sale of the Astroluck list, groups of scam artists in Canada, the Caribbean and elsewhere had the names of Mr. Guthrie and millions of other Americans, authorities say. Such countries are popular among con artists because they are outside the jurisdiction of the United States.

The thieves would call and pose as government workers or pharmacy employees. They would contend that the Social Security Administration's computers had crashed, or prescription records were incomplete. Payments and pills would be delayed, they warned, unless the older Americans provided their banking information.

Many people hung up. But Mr. Guthrie and hundreds of others gave the callers whatever they asked.

"I was afraid if I didn't give her my bank information, I wouldn't have money for my heart medicine," Mr. Guthrie said.

Criminals can use such banking data to create unsigned checks that withdraw funds from victims' accounts. Such checks, once widely used by gyms and other businesses that collect monthly fees, are allowed under a provision of the banking code. The difficult part is finding a bank willing to accept them.

In the case of Mr. Guthrie, criminals turned to Wachovia.

Between 2003 and 2005, scam artists submitted at least seven unsigned checks to Wachovia that withdrew funds from Mr. Guthrie's account, according to banking records. Wachovia accepted those checks and forwarded them to Mr. Guthrie's bank in Iowa, which in turn sent back $1,603 for distribution to the checks' creators that submitted them.

Within days, however, Mr. Guthrie's bank, a branch of Wells Fargo, became concerned and told Wachovia that the checks had not been authorized. At Wells Fargo's request, Wachovia returned the funds. But it failed to investigate whether Wachovia's accounts were being used by criminals, according to prosecutors who studied the transactions.

In all, Wachovia accepted $142 million of unsigned checks from companies that made unauthorized withdrawals from thousands of accounts, federal prosecutors say. Wachovia collected millions of dollars in fees from those companies, even as it failed to act on warnings, according to records.

In 2006, after account holders at Citizens Bank were victimized by the same thieves that singled out Mr. Guthrie, an executive wrote to Wachovia that "the purpose of this message is to put your bank on notice of this situation and to ask for your assistance in trying to shut down this scam."

But Wachovia, which declined to comment on that communication, did not shut down the accounts.

Banking rules required Wachovia to periodically screen companies submitting unsigned checks. Yet there is little evidence Wachovia screened most of the firms that profited from the withdrawals.

In a lawsuit filed last year, the United States attorney in Philadelphia said Wachovia received thousands of warnings that it was processing fraudulent checks, but ignored them. That suit, against the company that printed those unsigned checks, Payment Processing Center, or P.P.C., did not name Wachovia as a defendant, though at least one victim has filed a pending lawsuit against the bank.

During 2005, according to the United States attorney's lawsuit, 59 percent of the unsigned checks that Wachovia accepted from P.P.C. and forwarded to other banks were ultimately refused by other financial institutions. Wachovia was informed each time a check was returned.

"When between 50 and 60 percent of transactions are returned, that tells you at gut level that something's not right," said the United States attorney in Philadelphia, Patrick L. Meehan.

**AFTERMATH** Tony Unspach takes care of bills and banking for his grandfather, Richard Guthrie, a victim of fake telemarketers.
Ozier Muhammad/The New York Times

Other banks, when confronted with similar evidence, have closed questionable accounts. But Wachovia continued accepting unsigned checks printed by P.P.C. until the government filed suit in 2006.

Wachovia declined to respond to the accusations in the lawsuit, citing the continuing civil litigation.

Although Wachovia is the largest bank that processed transactions that stole from Mr. Guthrie, at least five other banks accepted 31 unsigned checks that withdrew $9,228 from his account. Nearly every time, Mr. Guthrie's bank told those financial institutions the checks were fraudulent, and his money was refunded. But few investigated further.

The suit against P.P.C. ended in February. A court-appointed receiver will liquidate the firm and make refunds to consumers. P.P.C.'s owners admitted no wrongdoing.

Wachovia was asked in detail about its relationship with P.P.C., the withdrawals from Mr. Guthrie's account and the accusations in the United States attorney's lawsuit. The company declined to comment, except to say: "Wachovia works diligently to detect and end fraudulent use of its accounts. During the time P.P.C. was a customer, Wachovia honored all requests for returns related to the P.P.C. accounts, which in turn protected consumers from loss."

Prosecutors argue that many elderly accountholders never realized Wachovia had processed checks that withdrew from their accounts, and so never requested refunds. Wachovia declined to respond.

The bank's statement continued: "Wachovia is cooperating fully with authorities on this matter."

**Some Afraid to Seek Help**

By 2005, Mr. Guthrie was in dire straits. When tellers at his bank noticed suspicious transactions, they helped him request refunds. But dozens of unauthorized withdrawals slipped through. Sometimes, he went to the grocery store and discovered that he could not buy food because his account was empty. He didn't know why. And he was afraid to seek help.

"I didn't want to say anything that would cause my kids to take over my accounts," he said. Such concerns play into thieves' plans, investigators say.

"Criminals focus on the elderly because they know authorities will blame the victims or seniors will worry about their kids throwing them into nursing homes," said C. Steven Baker, a lawyer with the Federal Trade Commission. "Frequently, the victims are too distracted from dementia or Alzheimer's to figure out something's wrong."

Within a few months, Mr. Guthrie's children noticed that he was skipping meals and was behind on bills. By then, all of his savings — including the proceeds of selling his farm and money set aside to send great-grandchildren to college — was gone.

State regulators have tried to protect victims like Mr. Guthrie. In 2005, attorneys general of 35 states urged the Federal Reserve to end the unsigned check system.

"Such drafts should be eliminated in favor of electronic funds transfers that can serve the same payment function" but are less susceptible to manipulation, they wrote.

But the Federal Reserve disagreed. It changed its rules to place greater responsibility on banks that first accept unsigned checks, but has permitted their continued use.

Today, just as he feared, Mr. Guthrie's financial freedom is gone. He gets a weekly $50 allowance to buy food and gasoline. His children now own his home, and his grandson controls his bank account. He must ask permission for large or unusual purchases.

And because he can't buy anything, many telemarketers have stopped calling.

"It's lonelier now," he said at his kitchen table, which is crowded with mail. "I really enjoy when those salespeople call. But when I tell them I can't buy anything now, they hang up. I miss the good chats we used to have."