## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALEXUS MURPHY; MARKITTA WITCHER; and DIANE HAINES, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ACTIVE INTEREST MEDIA, INC., <br><br> Defendant. | Case No. 2:22-cv-12159-DML-APP <br><br> Hon. David M. Lawson <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Alexus Murphy ("Plaintiff Murphy"), Markitta Witcher ("Plaintiff Witcher"), and Diane Haines ("Plaintiff Haines") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## INTRODUCTION

1.      Defendant Active Interest Media, Inc. ("AIM") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiffs' AIM magazine subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed their information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Plaintiffs have received

a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing

Plaintiffs' Private Reading Information (defined below) during the relevant pre-July 31,

2016 time period[1], AIM violated Michigan's Preservation of Personal Privacy Act, H.B.

---

[1]     The statutory period for this action is six years, which is 2,190 days. *See* M.C.L. §
600.5813.

        The applicable six-year limitation period was tolled for 101 days pursuant to
Executive Orders issued by the Governor of Michigan during the COVID-19
pandemic. *See* Mich. Executive Order No. 2020-58 ("[A]ll deadlines applicable to the
commencement of all civil and probate actions and proceedings, including but not
limited to any deadline for filing an initial pleading . . . are suspended as of March 10,
2020 and shall be tolled until the end of the declared states of disaster and emergency.");
Mich. Supreme Court Administrative Order No. 2020-3 ("For all deadlines applicable
to the commencement of all civil and probate case types, including but not limited to
the deadline for the initial filing of a pleading . . . any day that falls during the state of
emergency declared by the Governor related to COVID-19 is not included."); Mich.
Executive Order No. 2020-122 (ending tolling period on June 20, 2020); Mich. Supreme
Court Administrative Order No. 2020-18 (same); *see also Straus v. Governor*, 592 N.W.2d
53, 57 (Mich. 1999) (under Michigan law "the Governor's action [in issuing an
Executive Order] has the status of enacted legislation"); *Blaha v. A.H. Robins & Co.*, 708
F.2d 238, 239 (6th Cir. 1983) ("Pursuant to the Erie doctrine, state statutes of limitations
must be applied by federal courts sitting in diversity.").

        The applicable six-year limitation period was additionally tolled for 117 days,
from May 17, 2022 through September 11, 2022, during the pendency of the action
*Taylor et al. v. Active Interest Media, Inc.,* 1:22-cv-00447-HYJ-RSK (W.D. Mich.) (putative
class action brought on behalf of the same putative class in this case, filed May 17, 2022
and dismissed on September 14, 2022). *See Cowles v. Bank West*, 719 N.W.2d 94, 101
(Mich. 2006) (explaining that, under Michigan law, "[t]he statute of limitations is tolled
as to all persons within the class described in the complaint on the commencement of
an action asserting a class action." (citing M.C.R. § 3.501(F)(1)); *Boelter v. Hearst
Commn'c'ns Inc.*, 269 F. Supp. 3d 172, 187-89 (S.D.N.Y. 2017) (holding that M.C.R.
3.501(F)(1) applies in federal court, and that the statute of limitations for the PPPA
claims of putative class members is tolled by the filing of a putative class action); *see also
Philips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006) ("[C]ourts thus disregard the
jurisdictional void that is created when the named plaintiffs' claims are dismissed and,
shortly afterwards, surrogates step forward to replace the named plaintiffs.").

5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2. Documented evidence confirms these facts. For example, AIM offers, through list broker NextMark, Inc. ("NextMark"), to provide renters access to the mailing list titled "Active Interest Media Enhanced Masterfile Mailing List", which contains the Private Reading Information of all 460,863 of AIM's active U.S. subscribers at a base price of "$110.00/M [per thousand]," (i.e., 11 cents apiece), as shown in the screenshot below:

---

Thus, the applicable statutory period for this action is February 8, 2016 (2,408 days prior to the commencement of the instant action on September 12, 2022) through July 30, 2016.

[2]   In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).



*See* **Exhibit A** hereto.

3.     A similar "data card," with the same rates shown above, was also publicly advertised by AIM during the relevant pre-July 31, 2016 time period, with a slightly different title.  For the entire duration of the relevant pre-July 31, 2016 time period, AIM offered, through NextMark and other list brokers, including SRDS, Inc., to provide renters access to the mailing list titled "Active Interest Media Masterfile - Wiland Modeled Selection Program," which contained the Private Reading Information of all 1,574,000 subscribers to all of AIM's publications, at a base price of $110.00/M

per thousand, (i.e., 11 cents apiece).[3]  During the relevant pre-July 31, 2016 time period, AIM made the following statement, among others, on its "Active Interest Media Masterfile - Wiland Modeled Selection Program" data card: "Wiland members can have their custom models applied to the Active Interest Media masterfile, allowing them to reach their ideal target audience."

4.    The term "Wiland" (appearing in the title of the data card in effect throughout the relevant pre-July 31, 2016 time period) refers to Wiland, Inc. – a data cooperative and data appending company that offers, *inter alia*, list "enhancement" and "prospecting" services to its clients. Wiland's clients, such as AIM,  use these services, and used these services during the relevant pre-July 31, 2016 time period, by transmitting their entire subscriber files to Wiland, who in turn "appends" additional demographic and personal data about each subscriber to the file, thereby "enhancing" it (i.e., making it more valuable, and allowing the publisher to rent its lists to third parties for more money and to exchange its lists to other third parties on more favorable terms), and also provides the publisher client with the Personal Reading Information of other individuals who are not existing subscribers to its publications but who fit certain pre-determined criteria that render them likely to be interested in purchasing subscriptions to its publications, i.e., "prospects" who the publisher then markets its publications to.

---

[3]    This data card titled "Active Interest Media Masterfile - Wiland Modeled Selection Program" was accessible during the relevant pre-July 31, 2016 time period at http://www.srds.com/directnet/dnet?action=recoListDetail&mid=986767&unit=0, and was assigned the ID number 986767 by SRDS.

Plaintiffs are informed and believe, and thereupon allege, that, throughout the relevant pre-July 31, 2016 time period, AIM (as a data "enhancement" and "prospecting" client of Wiland's) was contractually obligated to provide Wiland the Personal Reading Information of all of the subscribers (as well as all of the recently expired subscribers) to all of its publications, on a periodic and regular basis (at least as frequently as once a month), which Wiland then used to facilitate its list enhancement and prospecting services. Thus, because AIM was a client of Wiland's throughout the relevant pre-July 31, 2016 time period (as evidenced by AIM's advertising of its "Active Interest Media Masterfile - Wiland Modeled Selection Program" throughout that time period), AIM necessarily transmitted all of its subscribers' Personal Reading Information (including Plaintiffs' and all Class members' Personal Reading Information) to Wiland on at least as frequently as a monthly basis over the same time period.

5.     The lists advertised for sale in the "data cards" referenced above in paragraphs 2 and 3 (and all of the other "data cards" advertised by AIM between the commencement of the relevant pre-July 31, 2016 time period and the present) include, *inter alia*, the full names and addresses of each person who purchased a subscription to an AIM publication and the title of the publication that each of them subscribed to; indeed, the postal-mail envelope logo in the "channels" field of the data card (which appeared on all of the data cards referenced herein) indicates that the advertised mailing list contains the necessary information (i.e., name and address) for the renters, exchangers, and purchasers of the list to contact the subscribers whose information

6

appears on it via postal mail.  And the Personal Reading Information contained on the mailing lists advertised in the data cards referenced herein originates, and throughout the relevant pre-July 31, 2016 time period originated, directly from AIM prior to being disclosed to the renters, purchasers, and exchangers of this data; indeed, all of the data cards referenced in this First Amended Complaint (and in existence between the commencement of the relevant pre-July 31, 2016 time period and the present) contained AIM's trademarked logo, which AIM expressly authorized to be affixed thereon.

6.      Thus, for the entire duration of the pre-July 31, 2016 time period, AIM was continuously and systematically (at least as frequently as once a month) renting, selling, exchanging, and otherwise disclosing all of its customers' Private Reading Information (including Plaintiffs' and all Class members' Private Reading Information) to Wiland and numerous other third parties for appending, enhancement, prospecting, and rental purposes.

7.      As a result of AIM's practices of disclosing Plaintiffs' Private Reading Information during the relevant pre-July 31, 2016 time period, as alleged herein, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period.

8.      By renting, exchanging, or otherwise disclosing the Private Reading Information of all of its Michigan-based subscribers during the relevant pre-July 31, 2016 time period, AIM violated the PPPA.  Subsection 2 of the PPPA provides:

7

> [A] person, or an employee or agent of the person, engaged
> in the business of selling at retail, renting, or lending books
> or other written materials . . . shall not disclose to any person,
> other than the customer, a record or information concerning
> the purchase . . . of those materials by a customer that
> indicates the identity of the customer.

PPPA § 2.

9.     Accordingly, Plaintiffs bring this First Amended Class Action Complaint against AIM for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

## NATURE OF THE CASE

10.     To supplement its revenues, AIM rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as age, gender, income, and financial and lifestyle information—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.  AIM continuously and systematically engaged in these same practices (disclosing its entire database of its subscribers' Private Reading Information to Wiland and numerous other third parties, at least as frequently as once a month) throughout the entire relevant pre-July 31, 2016 time period.

8

11.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, AIM is able to disclose the information time and time again to countless third parties.

12.     AIM's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

13.     While AIM profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because AIM does not obtain its customers' written consent prior to disclosing their Private Reading Information.

## **PARTIES**

14.     Plaintiff Murphy is a natural person and was a citizen and resident of the State of Michigan at all relevant times mentioned herein.  Plaintiff Murphy was a subscriber to *Arts & Crafts Homes* magazine, including prior to July 31, 2016.  *Arts & Crafts Homes* magazine is published by AIM.  While residing in, a citizen of, and present in Michigan, Plaintiff Murphy purchased her subscription to *Arts & Crafts Homes* magazine directly from AIM.  Prior to and at the time Plaintiff Murphy subscribed to *Arts & Crafts Homes*, AIM did not notify Plaintiff Murphy that it discloses the Private Reading Information of its customers, and Plaintiff Murphy has never authorized AIM to do so.  Furthermore, Plaintiff Murphy was never provided any written notice that

AIM rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.  Since subscribing to *Arts & Crafts Homes*, and during the relevant pre-July 31, 2016 time period, AIM disclosed, without the requisite consent or prior notice, Plaintiff Murphy's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, AIM rented or exchanged mailing lists containing Plaintiff Murphy's Private Reading Information to third parties seeking to contact AIM subscribers, without first obtaining the requisite written consent from Plaintiff Murphy or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

15.     Plaintiff Witcher is a natural person and was a citizen and resident of the State of Michigan at all relevant times mentioned herein.  Plaintiff Witcher was a subscriber to *Anglers Journal* magazine, including prior to July 31, 2016.  *Anglers Journal* magazine is published by AIM.  While residing in, a citizen of, and present in Michigan, Plaintiff Witcher purchased her subscription to *Anglers Journal* magazine directly from AIM.  Prior to and at the time Plaintiff Witcher subscribed to *Anglers Journal*, AIM did not notify Plaintiff Witcher that it discloses the Private Reading Information of its customers, and Plaintiff Witcher has never authorized AIM to do so.  Furthermore, Plaintiff Witcher was never provided any written notice that AIM rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.  Since subscribing to *Anglers Journal*, and during the relevant pre-July 31, 2016 time

period, AIM disclosed, without the requisite consent or prior notice, Plaintiff Witcher's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, AIM rented or exchanged mailing lists containing Plaintiff Witcher's Private Reading Information to third parties seeking to contact AIM subscribers, without first obtaining the requisite written consent from Plaintiff Witcher or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

16.     Plaintiff Haines is a natural person and was a citizen and resident of the State of Michigan at all relevant times mentioned herein.   Plaintiff Haines was a subscriber to *Garden Gate* magazine, including prior to July 31, 2016.  *Garden Gate* magazine is published by AIM.  While residing in, a citizen of, and present in Michigan, Plaintiff Haines purchased her subscription to *Garden Gate* magazine directly from AIM. Prior to and at the time Plaintiff Haines subscribed to *Garden Gate*, AIM did not notify Plaintiff Haines that it discloses the Private Reading Information of its customers, and Plaintiff Haines has never authorized AIM to do so.  Furthermore, Plaintiff Haines was never provided any written notice that AIM rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.  Since subscribing to *Garden Gate*, and during the relevant pre-July 31, 2016 time period, AIM disclosed, without the requisite consent or prior notice, Plaintiff Haines's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that

11

same period, AIM rented or exchanged mailing lists containing Plaintiff Haines's Private Reading Information to third parties seeking to contact AIM subscribers, without first obtaining the requisite written consent from Plaintiff Haines or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

17. Defendant Active Interest Media, Inc. is a Colorado corporation with its headquarters and principal place of business in Boulder, Colorado. AIM does business throughout Michigan and the entire United States. AIM is the publisher of *Anglers Journal*, *Cuisine At Home*, *Arts & Crafts Homes*, *Horticulture*, *Garden Gate*, *Old House Journal*, *Passagemaker*, *Popular Woodworking*, *Power & Motoryacht*, *Sail, Soundings*, *Soundings Trade Only*, *Urban Climber*, *Woodshop News*, *Woodsmith*, *Writer's Digest and Yachts International*, and *Log & Timber Home Living*.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

19. The Court has personal jurisdiction over AIM because Plaintiffs' claims arose in substantial part from actions and omissions in Michigan, including from their purchases of AIM magazine subscriptions in Michigan, AIM's direction of such subscriptions into Michigan, and AIM's failure to obtain Plaintiffs' written consent in Michigan prior to disclosing their Private Reading Information, including their

residential addresses in Michigan, to another person, the effects of which were felt from within Michigan by citizens and residents of Michigan. Personal jurisdiction also exists over AIM in Michigan because AIM conducts substantial business within Michigan, such that AIM has significant, continuous, and pervasive contacts with the State of Michigan.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because at least one of the Plaintiffs reside in this judicial District, AIM does substantial business in this judicial District, AIM is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

21.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

22.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from

disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich.

Legis. Serv. 378 (West).

23.    Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged
> in the business of selling at retail, renting, or lending books
> or other written materials . . . *shall not disclose* to any person,
> other than the customer, a record or information concerning
> the purchase . . . of those materials by a customer that
> indicates the identity of the customer.

PPPA § 2 (emphasis added).

24.    Michigan's protection of reading information reflects the "gut feeling

that people ought to be able to read books and watch films without the whole world

knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel

the growth of individual thought.  The whole process of intellectual growth is one of

privacy—of quiet, and reflection.  This intimate process should be protected from the

disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep.

McCandless).

25.    As Senator Patrick Leahy recognized in proposing the Video and Library

Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. §

2710), "[i]n practical terms our right to privacy protects the choice of movies that we

watch with our family in our own homes.  And it protects the selection of books that

we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

14

26.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

27.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

28.     Despite the fact that thousands of Michigan residents subscribe to AIM's publications, AIM disregarded its legal responsibility by systematically violating the PPPA.

### The Private Information Market:
### Consumers' Private Information Has Real Value

29.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[4]

---

[4]     **Exhibit C**, The Information Marketplace:  Merging and Exchanging Consumer Data    (Mar.    13,    2001),    at    8:15-11:16,    *available    at*

30.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[5]

31.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[6]

32.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[7]

---

https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

[5]     *See* **Exhibit D**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited July 30, 2021).

[6]     **Exhibit E**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

[7]     *See* **Exhibit F**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

33.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[8]

34.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[9]

35.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[10]

---

[8]     **Exhibit G**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N120616S.pdf (last visited July 30, 2021).

[9]     **Exhibit H**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[10]    *See* **Exhibit I**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-

36.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[11]

37.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[12] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like AIM share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[13]

38.     Information disclosures like those made by AIM are particularly

---

query-data-brokers-about-practices-involving-consumers-personal-information     (last visited July 30, 2021).

[11]     *Id.*

[12]     *See* **Exhibit J**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[13]     **Exhibit K**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[14]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[15] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

39.     Thus, information disclosures like AIM's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[16]

40.     AIM is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

---

[14]     *Id.*

[15]     **Exhibit L**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

[16]     *See id.*

41.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

*Consumers Place Monetary Value on Their Privacy and*
*Consider Privacy Practices When Making Purchases*

42.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

43.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[17]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[18]

44.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

---

[17]     *See* **Exhibit M**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[18]     *Id.*

45.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[19]

46.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[20]

47.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[21]

### AIM Unlawfully Rents, Exchanges, And Discloses Its Customers' Private Reading Information

---

[19]     *See* **Exhibit N**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[20]     *See* **Exhibit O**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), cited in European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[21]     *See* **Exhibit P**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

48.     AIM maintains a vast digital database comprised of its customers' Private Reading Information.  AIM discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each AIM customer, including his or her age, gender, income, and financial and lifestyle information.  (*See, e.g.*, **Exhibit A**).

49.     AIM then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

50.     AIM also discloses its customers' Private Reading Information to data cooperatives, who in turn give AIM access to their own mailing list databases.

51.     As a result of AIM's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from AIM that identify AIM's customers by their most intimate details such as their age, gender, income, and financial and lifestyle information.  AIM's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

52.     AIM does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

53.     AIM was actively engaged in these practices throughout the relevant pre-July 31, 2016 time period.  During that time period, AIM systematically rented, sold, exchanged, or otherwise disclosed all of its subscribers' Private Reading Information to various data aggregators and appenders, data brokers, list managers, and other third parties, including but not limited to Wiland.

54.     Consumers can sign up for subscriptions to AIM's publications through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, AIM never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016 time period, AIM uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information.

55.     As a result, AIM disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our

lives, from our political and religious beliefs to our health concerns"[22] – to anybody willing to pay for it.

56.     By and through these actions, AIM has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

57.     Plaintiffs seek to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by AIM without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

58.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

59.     Common questions of law and fact exist as to all Class members and

---

[22]     **Exhibit Q**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether AIM is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether AIM obtained consent before disclosing to third parties Plaintiffs' and the Class's Private Reading Information; and (c) whether AIM's disclosure of Plaintiffs' and the Class's Private Reading Information violated the PPPA.

60.   The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Private Reading Information.

61.   Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

62.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.

Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of Michigan's Preservation of Personal Privacy Act
### (PPPA § 2)

63.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant AIM.

65.     As a magazine publisher that sells subscriptions to consumers, AIM is engaged in the business of selling written materials at retail.  *See* PPPA § 2.

66.     By purchasing subscriptions to AIM's publications, each of the Plaintiffs purchased written materials directly from AIM.  *See* PPPA § 2.

67.     Because Plaintiffs purchased written materials directly from AIM, they are each a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

26

68.     At various times during the pre-July 31, 2016 time period, AIM disclosed Plaintiffs' Private Reading Information, which identified each of them as a customer who purchased an AIM publication, in at least three ways.

69.     First, AIM disclosed mailing lists containing Plaintiffs' Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to AIM.

70.     Second, AIM disclosed mailing lists containing Plaintiffs' Private Reading Information to data cooperatives, who in turn gave AIM access to their own mailing list databases.

71.     Third, AIM rented and/or exchanged its mailing lists containing Plaintiffs' Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

72.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and AIM was able to increase its profits gained from the mailing list rentals and/or exchanges.

73.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, AIM disclosed to persons other than

Plaintiffs records or information concerning their purchases of written materials from AIM.  *See* PPPA § 2.

74.    The information AIM disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to particular AIM publications.  Accordingly, the records or information disclosed by AIM indicated Plaintiffs' identities.  *See* PPPA § 2.

75.    Plaintiffs and the members of the Class never consented to AIM disclosing their Private Reading Information to anyone.

76.    Worse yet, Plaintiffs and the members of the Class did not receive notice before AIM disclosed their Private Reading Information to third parties.

77.    AIM's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

78.    AIM's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their subscriptions.

79.    AIM's disclosures of Plaintiffs' Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase AIM's revenue. Accordingly, AIM's disclosures were not made for the exclusive purpose of marketing

goods and services directly to Plaintiffs and the members of the Class.

80.     By disclosing Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, AIM violated Plaintiffs' and the Class's statutorily protected right to privacy in their reading habits. *See* PPPA § 2.

81.     As a result of AIM's unlawful disclosure of their Private Reading Information, Plaintiffs and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).  On behalf of themselves and the Class, Plaintiffs seek: (1) $5,000.00 to each of the Plaintiffs and each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act;

C.     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.     For an award of $5,000 to each of the Plaintiffs and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.   For prejudgment interest on all amounts awarded; and

F.   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: December 12, 2022     Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2022, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ E. Powell Miller
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com